UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COOPER LIGHTING, LLC and | § | |
| EATON US HOLDINGS, INC., | § | |
| | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 4:13-CV-2640 |
| | § | |
| PRAMOD KUMAR and | § | |
| ACUITY BRAND LIGHTINGS, INC. | § | |
| | § | |
|     Defendants. | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion to Transfer (Doc. No. 2) and Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 7.). After considering the Motions, all responses and replies, the evidence presented to the court at the October 2, 2013 hearing, and the applicable law, the Court concludes that both motions should be **DENIED**.

## I.    BACKGROUND

### A.  Factual Background[1]

#### 1.  *Mr. Kumar Builds a Career at Cooper*

Defendant Pramod Kumar began working at Plaintiff Cooper Lighting, LLC[2] in January 2001. (Oct. 2 Hearing Transcript (hereinafter "Tr.") 78:8.) One of the three largest lighting manufacturers in the United States, Cooper Lighting manufactures, produces, designs, markets, and sells commercial and residential lighting products. (Tr. 17:1-6.) Its lighting products include ambient lighting, as well as recessed lighting and products like dimmers and controls that "influence daylighting and daylight harvesting." (Tr. 17:14-15.)

---

[1] The Court's description of the "Factual Background" is open to revision as discovery proceeds.
[2] Cooper is owned and controlled by Eaton, PLC. (Tr. 19:2.)

By 2010, Mr. Kumar had assumed the role of Director of New Product Design for Ambient Lighting and he was the manager for offshore design engineering, working out of Peachtree City, Georgia.  (Tr. 78:14-19.)  According to Mr. Kumar, "[a]mbient lighting is a general purpose lighting for lighting space with artificial lights," such as one might find in an industrial warehouse, a retail store, or a courtroom.  (Tr. 79:5-15.)  Bart Ideker, Cooper's Vice President of Engineering and Mr. Kumar's former boss, testified that ambient lighting makes up about half of the general commercial lighting market.  (Tr. 21:13.)

As Director of New Product Development, Mr. Kumar's primary duties were engineering and research and development for ambient and LED lighting.  (Tr. 81:5-6, 18.)  He managed a team of engineers and oversaw vendor negotiations.  (Tr. 81:6-12.)  But in the main, Mr. Kumar's "primary responsibility was to design, test, and launch new products."  (Tr. 21:16-17.)  He was also responsible for integrating sensors and other lighting control products into the ambient lighting products.  (Tr. 21:24-25:2.)

Earlier this year, Mr. Kumar transitioned into the role of Director of Product Design.  (Tr. 82:15.)  In that role, he "mainly work[ed] with customization of fixtures."  (Tr. 82:20.)  His focus remained on LED and fluorescent lights and he continued to serve as Manager of Offshore Development.  (Tr. 83:12-15.)  Mr. Kumar remained in Peachtree City, Georgia.  (Tr. 83:20.)

In his latter two roles at Cooper, Mr. Kumar "was privy to tremendous amount of new technology, and knew pretty much all of [Cooper's] cost structure," according to Mr. Ideker.  (Tr. 21:17-19.)  Mr. Kumar also "knew a lot of information about sales and margins, he knew obviously a lot of [Cooper's] customer base.  He specifically was brought in on large customer bids and jobs and orders throughout his career."  (Tr. 23:14-19.)  Because he led "strategic planning for new products," Mr. Kumar had "tremendous knowledge of a very proprietary

technology [Cooper] developed in [Mr. Kumar's] last couple of years there." (Tr. 23:22-25.) Mr. Kumar had access to product design information for the business that he managed. (Tr. 84:2-5.) He was also aware of patents filed by his team pertaining to fluorescent and LED lighting. (Tr. 84:14-19.) Likewise, he had access to Cooper's marketing strategies and pricing information for ambient and LED lighting. (Tr. 84:22, 85:1-2.) But, his customer interactions were next to none: from 2010 until he left the company, Mr. Kumar did not interact with any customers on Cooper's behalf. (Tr. 85:18-20; 107:25)

Cooper granted Mr. Kumar stock options in 2011, 2012, and 2013. (Tr. 85:23-86:13.) The 2012 Nonqualified Stock Option Agreement ("2012 Grant") contained a clause that restricted Mr. Kumar's use of confidential information and restricted him, for a period of one year following his departure from Cooper, from serving, within a certain geographic area, in a competitive role with one of Cooper's competitors. (Doc. No. 7-2 at 3.) The 2012 Grant defined the "restricted territory" as "the specific geographic area(s) or territories in which the Employee engaged in business on behalf of" Cooper. (*Id.*) It defined "Competitive Role" as "any assistance, service, or ownership relating to the customers, markets, products and/or services for which the Employee held responsibility during the Employee's employment with" Cooper. (*Id.*) Affixed to the 2012 Grant was an "Exhibit A," which listed seventeen other companies that Cooper considered competitors. (Doc. 7-2 at 6.) Mr. Kumar characterized the list as including "all the major lighting companies." (Tr. 89:10.) By agreement of all who testified before the Court, they make up 75-90 percent of the lighting industry. (*See* Tr. 62:13-14; 89:9-11; 128:23.) By Mr. Kumar's own calculations, the 2012 Grant was worth about $17,000. (Tr. 88:9.)

Mr. Kumar also signed a 2013 Grant of Shares, this time with Defendant Eaton Holdings, Inc., which had acquired Cooper. (Tr. 86:11-13; Doc No. 13-2 at 2.) Mr. Kumar represented to

3

the Court that he believed that each agreement he signed superseded the prior version, such that once he had signed the 2013 Grant, the contractual provisions in the 2012 Grant no longer controlled.  (Tr. 86:11-21.)  Mr. Kumar understood the 2013 Grant to dictate that he "was not allowed to work for Cooper or for Cooper's competitors for one year after [he] resigned from Cooper."  (Tr. 89:22-24.)  But, he believed that restriction extended only to products that he worked on at Cooper.  (Tr. 90:2.)

### 2. *Mr. Kumar Searches for New Employment*

Though an engineer by training and in his daily duties for Cooper, Mr. Kumar's "desire was always to go in the commercial side of the business." (Tr. 90:6-7.)  From 2007 on, he had raised the possibility of such a transition in his performance reviews, and though he had the chance to interview for a business manager role in 2011, he never secured such a position with Cooper.  (Tr. 90:6-17.)  In 2012, he was told he would have to move to a less senior position in order to transition to a commercial role.  (Tr. 90:16-17.)

Mr. Kumar therefore began discussions with other prospective employers.  (Tr. 90:19-20.)  One such prospective employer was Defendant Acuity Brands Lightings, Inc.  Acuity Brands Lighting is "by far [Cooper's] largest competitor, and . . . particularly in the ambient area, [the two companies] are one and two and compete every day." (Tr. 22:6-8.)  Most business is done in North America, but there is an international market, according to Mr. Ideker, who served as Mr. Kumar's boss at Cooper.  (Tr. 22:11-15.)  Cooper and Acuity share many of the same customers.  (Tr. 23:4-5.)

Mr. Kumar interviewed with Value Stream Leaders — general managers — at Acuity's office in Conyers, Georgia.  (Tr. 93:11-16.)  Fawaz Khalil, Acuity's Vice President and General Manager for Industrial Emergency Wiring and Daylighting Solutions, testified that he oversaw

4

Acuity's hiring of Mr. Mr. Kumar.  (Tr. 121:17-18; 112:14.)  Mr. Khalil explained that when he first saw Mr. Kumar's resume, Mr. Khalil believed Mr. Kumar would be a good fit for an engineering position.  (Tr. 123:24-124:4.)  But, when Mr. Kumar supplied Acuity with the 2011, 2012, and 2013 non-compete agreements he had signed at Cooper — both Mr. Khalil and the Human Resources department asked to see any such agreements — Mr. Khalil decided to consider Mr. Kumar for other positions so as not to run afoul of those covenants.  (Tr. 91:1-6; 124:7-24.)  For instance, Mr. Kumar was no longer considered for the role of Vice President of Engineering and Research and Development.  (Tr. 124:24.)  Mr. Khalil said that Human Resources and Acuity's in-house legal department also reviewed Mr. Kumar's non-compete agreements but determined that hiring him for a daylighting position would not violate any of those contracts.  (Tr. 128:3-15.)

Mr. Khalil explained that Sunoptics, the daylighting business Mr. Kumar would ultimately run, is a relatively small division of Acuity and that he determined it would be a good place for Mr. Kumar, a longtime engineer, to ease into a business management role.  (Tr. 125:13-19.)  Asked why Acuity could not have simply hired another candidate with an MBA, Mr. Khalil explained that Mr. Kumar came across as the "most intelligent" candidate and that he "was clearly out-showing the other[]" candidates.  (Tr. 126:2-4.)  He acknowledged that Mr. Kumar's experience in the lighting industry was "definitely a plus," in that "he knows the market," which, "down the road" will "hold him in good standing."  (Tr. 126:13-17.)  But, on balance, Mr. Kumar was hired for "[p]roblem solving ability, his ability to manage multiple teams in different geographical areas, and his perception around business and understandings of what it takes to run a successful business, understanding of financial matters."  (Tr. 127:6-10.)

Much of the hearing testimony focused upon the extent to which daylighting and ambient lighting interact.  Mr. Kumar offered that some structures employ both electric and daylight products, (Tr. 109:21-23), and that a lighting system can involve both types of lights, (Tr. 110:17-20.)  Mr. Kumar also acknowledged that some daylighting products contain electric motors and controls that measure the amount of daylight to gauge the necessary amount of artificial lighting that must be supplied.  (Tr. 111:12-23.)  Mr. Ideker opined that he could "think of no practical commercial building space that you would use daylighting in without the application of electric lighting and generally control systems."  (Tr. 65:9-12.)  Cooper does not sell daylighting itself, but the third-party sales agents that sell its products "oftentimes will complete a package with someone else that does daylighting, and [Cooper] will combine [its] electric lighting and [its] control systems with whatever daylighting the customer specifies."  (Tr. 65:14-22.)

Mr. Khalil explained that "daylighting products go to market a very different way [from other products].  We have direct sales team employed by Acuity, employed by Sunoptics, who don't sell any other Acuity Products.  Sensors, controls, luminaires, they don't.  All they sale [sic] are skylights."  (Tr. 151:1-18.)  He also explained that when a large-scale construction project begins — he used a mall as his example — a general contractor would bid luminaires — like what Mr. Kumar worked on for Cooper — and skylights — like what he is to work on at Acuity — to different providers.  (Tr. 152:7-153:5.)

Sunoptics displays on its web site a photo and blurb about Coca-Cola, a Sunoptics client, which Mr. Ideker testified is also a Cooper client.  (Tr. 35:16-21.)  That blurb stated that Coke had "integrat[ed] high bay T5 lighting systems with photocells and a lighting control system in addition to the Sunoptics Signature Series skylights."  (Pl. Hearing Ex. 10.)  Mr. Ideker

6

explained that T5 lighting referred to fluorescent tubes, so in essence, the design Sunoptics bragged about on its web site was identical to what Mr. Kumar worked on at Cooper.  (Tr. 36:3-11.)  Sunoptics's promotional materials also included a picture of a retail store that employed natural light and florescent ambient lighting.  (Tr. 37:20; Ex. 10.)  Mr. Ideker described that sort of setup as typical of the business both Cooper and Acuity did.  (Tr. 37:23-38:4.)  He also explained that, at the lighting industry's largest trade show last April, a product that combines a solar tube and an electric tube garnered the show's most prestigious award.  (Tr. 39:2-24.)  Mr. Ideker believes that "a lot of the knowledge that Mr. Kumar gained, particularly the proprietary knowledge [Cooper has] patented, could really be used as a combination . . . [to] make a very, very compelling product when combined with a solar tube."  (Tr. 39:20-24.)

### 3.  Mr. Kumar Joins Acuity

Mr. Kumar accepted an offer to join Acuity, and on June 28, told Mr. Ideker that he was leaving to be a value stream leader at Acuity, where he would focus on the daylighting business. (Tr. 93:25; 94:2-6.)  Mr. Ideker says that he promptly informed Mr. Kumar that, in view of the fact that Acuity appeared on the list of companies in the non-compete, Mr. Kumar's move "was going to be an issue."  (Tr. 26:19-21.)  Mr. Kumar decided to take two weeks off of work before starting at Acuity, both to spend time with his family and "to send a clear message that [he was] not trying to breach the contract."  (Tr. 94:22-23.)  Cooper was, at the time, in the process of releasing a new product.  (Tr. 95:2-4.)

In his current role as Value Stream Leader for daylighting at Acuity, Mr. Kumar operates more or less as the general manager for that line of Acuity's business.  (Tr. 96:11-14.)  As Mr. Khalil puts it, Mr. Kumar's "main responsibility is to deliver profits for that business, which includes undertaking strategy development for the daylighting business, understanding what the

7

market – who the different customers, segments are, what are the opportunities in the market, which products should we develop, how should we sell, how should we price them, and how — what should be our delivery mechanism and production.  Should we produce them here?  Should we outsource them?  Things of that nature." (Tr. 131:22-132:5.)

For example, Mr. Kumar helps to market skylights — lights that do not require electrical wires or electricity — to potential customers.  (Tr. 96:21-97:6.)  Daylighting can be sold as a standalone source of light (Tr. 97:20-22), or in conjunction with artificial or ambient lighting. (Tr. 98:9-11.)  Daylighting can also be used in conjunction with sensors that indicate how daylighting and artificial lighting should be used in tandem, but Mr. Kumar says that he does not have any role in marketing, researching, developing, or strategizing about those censors.  (Tr. 98:18-99:15.)  Mr. Kumar also claims not to have any contact with anyone at Acuity who is involved with artificial lighting.  (Tr. 100:1-4.)  In fact, Mr. Kumar does not do anything related to research and development for Acuity.  (Tr. 101:17-19.)  But, unlike in his role at Cooper, he now deals with customers.  (Tr. 101:25-102:1.)

When the Court held a hearing on these pending motions, there was considerable discussion about the job description Acuity penned for the role that Mr. Kumar would ultimately fill.  That blurb stated that the new hire would be "[l]eading a cross-functional team of indirect reports across product development, marketing, sales, engineering, production, and supply chain." (Tr. 115:13-17; Pl. Hearing Ex. 5.)  Mr. Khalil clarified that the job description written during the company's search is in large part an advertisement for Acuity and does not always end up matching perfectly with what individual ultimately hired is asked to do.  (Tr. 139:1-5.)  As such, Mr. Khalil explained that Mr. Kumar's responsibilities were custom tailored to comply with his Cooper non-compete agreements.  (Tr. 134:9-14.)  Mr. Khalil said that, in creating such

8

a plan, it was his belief that Cooper did not even have a daylighting business.  (Tr. 134:15-22.)
Mr. Khalil also explained that, while the job description stated that Acuity sought someone "to
drive key annual improvement priorities that cut across all product value streams," whomever
Acuity hired would be asked to implement those goals in his particular slice of the business.  (Tr.
147:12-148:19.)

Mr. Kumar testified that he has not provided Cooper's confidential information to anyone
at Acuity.  (Tr. 105:3-6.)  He stated that he has not been asked to share any information gleaned
from his prior employment, whether about product lines or strategic plans.  (Tr. 105:7-13.)
Further, he explained that he has not even spoken — in person, by e-mail, or by phone — with
anyone at Acuity who works on LED or ambient lighting.  (Tr. 105:14-18.)  Likewise, Mr.
Kumar testified that he is excused from any staff meeting when his colleagues wish to discuss
LED lighting.[3]  (Tr. 105:24-106:4.)  Mr. Khalil expressed his belief that Mr. Kumar works in a
silo at Acuity.  (Tr. 132:16.)  At the end of his direct examination, Mr. Kumar was asked
whether, if he wanted to, he would be able to use Cooper's confidential information in his new
role.  He responded:

> No I cannot.  I mean, this product line is completely different, there's no
> electricity flowing through it in the first place, and the customer base is
> completely different.  It's roofing contractors versus electric contractors.  So I
> would not be able to use any knowledge that I've gained at Cooper.

(Tr. 106:9-14.)  Mr. Khalil added that Acuity made clear in Mr. Kumar's offer letter that Acuity
did not expect Mr. Kumar to share any of Cooper's proprietary information.  (Tr. 135:4-5.)  Mr.
Khalil testified that Acuity employees were informed ahead of time that a former Cooper
employee would be joining the team and that they were not to engage him about his former

---

[3] Mr. Khalil testified to the same.  (*See* Tr. 135:4-20.)  On cross-examination, Cooper elicited that ambient lighting
staffers also attend Mr. Khalil's monthly staff meetings.  (Tr. 144:13-18.)

employer.  (Tr. 135:9-10.)  He added that he had no knowledge of Mr. Kumar sharing any of Cooper's confidential information with anyone at Acuity.  (Tr. 137:8-16.)

Since the state court first entered a TRO in this matter, Mr. Kumar's title and responsibilities have changed "tremendously."  (Tr. 102:17-21.)  Mr. Kumar has not been "able to make any person[nel] changes, . . . product decisions, . . . pricing decisions, . . . warranty deviation decisions, . . . [or] asset mo[ve]ment decisions."  (Tr. 102:22-103:2.)  Though he has continued to go in to the office each day, Mr. Kumar has "not [been] doing anything when" there.[4]  (Tr. 107:2-3.)  Instead, Mr. Khalil has filled Mr. Kumar's role (Tr. 140:20), a situation neither Mr. Kumar nor Mr. Khalil believes to be sustainable.  (Tr. 103:8-14; 141:6-12; 156:13.)  In fact, Mr. Kumar testified that he believes he will lose his job if he is forced to spend a year on the sidelines (Tr. 104:1), a belief corroborated by Mr. Khalil.  (Tr. 141:15-16.)  Mr. Kumar also explained that he cannot remain unemployed for the next nine months and that, if forced from the lighting industry, great uncertainty would result, as he has never worked in another sort of business.  (Tr. 104:18-22.)  He is his family's sole breadwinner.  (Tr. 105:2-3.)

### B.  Procedural Background

Cooper filed suit and an application for a Temporary Restraining Order in the 295th District Court for Harris County, Texas, on Sept. 3, 2013, alleging breach of a non-compete by Mr. Kumar and tortious interference with contract by Acuity.  (Doc. 1 at 1-2.)  The next day, as Cooper requested, that court's presiding judge entered a fourteen day TRO.  (Doc. No. 1-1 at 54.)  Soon thereafter, Acuity removed to federal court and filed a motion to transfer the case to the Northern District of Georgia.  (Doc. Nos. 1, 2.)

---

[4] Mr. Khalil offered a more detailed description of Mr. Kumar's activities since being forced from the role in which he was hired, explaining that Mr. Kumar has been serving primarily in a data analysis role.  (Tr. 145:2-9.)

This Court held a hearing on Sept, 11, 2013 on Cooper's motion to extend the TRO and granted that request through Oct. 2, when it held an evidentiary hearing on Cooper's motion for a preliminary injunction.   According to Mr. Ideker, enforcing the non-compete is important because, "We all sign these agreements and kind of tie ourselves together, and it's very important for our li[v]elihood that we stay competitive and that we not have an unfair competitive advantage used against us.  And I believe Mr. Kumar clearly to me violated that trust and for his own personal profit."  (Tr. 41:25-42:5.)

## II.      MOTION FOR A PRELIMINARY INJUNCTION

### A.  Legal Standard

"A preliminary injunction may be issued to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits."  *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).  "Granting or refusing" a temporary injunction is in the "sound discretion" of the trial judge.  *Nalco Chem. Co. v. Hall,* 347 F.2d 90, 92 (5th Cir. 1965).  In exercising that discretion, the judge "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction."  *Yakus v. United States,* 321 U.S. 414, 440 (1944); *see also Wooten v. Ohler,* 303 F.2d 759, 762 (5th Cir. 1962). The Fifth Circuit has also laid out four prerequisites for the "extraordinary relief of preliminary injunction."  *Allison v. Froehlke,* 470 F.2d 1123, 1126 (5th Cir. 1972).  A court should issue a preliminary injunction if the movant is able to establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006); *see also Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (same).

## B. ANALYSIS

### 1. *Likelihood of Success on the Merits*

#### a. *Which Contract Governs*

A potential threshold question is which non-compete governs.  Cooper contends that the 2012 agreement controls.  (*See* Doc. No. 7 at 13.)  In contrast, Acuity argues both that the 2013 agreement superseded the 2012 version, and that the 2012 non-compete is unenforceable.  (*See* Doc. No. 13 at 7, 12.)  Though they insist that it controls, Acuity and Kumar actually interpret the 2013 agreement as containing broader prohibitions on Mr. Kumar's activities.  (Doc. No. 13 at 8-9.)  But, they argue that it requires arbitrating this dispute rather than resolving it in court.  (*Id.* at 9.)  Thus, there is at least an argument that, if the 2013 agreement rendered the 2012 non-compete without effect, this court should not even decide this motion.[5]

The Court is not convinced that the 2012 agreement has been superseded.  "Texas courts have made clear that rights or obligations that may have vested or accrued under previous versions of a contract can only be modified or extinguished through the inclusion of express language that manifests such intent."  *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 342 (5th Cir. 2004) (collecting state court cases).  Here, Cooper's rights under the contract vested when it provided Mr. Kumar with the grant of shares.  And the 2013 agreement does not contain any express language that would suggest it was intended to be the sole agreement between the parties.  (*See* Doc. No. 13-2.)  The conclusion that the 2013

---

[5] Of course, there is also an argument that, even if the merits of the action must be decided in arbitration, the Court could entertain the motion for a preliminary injunction in order to maintain the status quo while the parties prepare to arbitrate.  The parties have not briefed this argument.

agreement — between Eaton and Kumar — did not replace the 2012 version — between Cooper and Kumar — is bolstered by the fact that the two agreements are between different parties. *See Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 366 (5th Cir. 2009) ("The other cases cited by [the parties] support the well-established contract principle that '[a] contract containing a term inconsistent with a term of an earlier contract *between the same parties* is interpreted as including an agreement to rescind the inconsistent term in the earlier contract.'" (citing 29 Williston on Contracts § 73:17 (4th ed. 2003))).

The Court thus rejects Acuity's call to ignore the 2012 non-compete.  But as explained below, that is not fatal to Acuity's case.

### b.  Likelihood of Success Under the 2012 Agreement

Acuity and Mr. Kumar argue that the 2012 non-compete is unenforceable.  "The enforceability of a non-compete agreement is a question of law for the court." *Traders Int'l, Ltd. v. Scheuermann*, CIV.A. H-06-1632, 2006 WL 2521336, at *7 (S.D. Tex. Aug. 30, 2006). However, rather than heeding Acuity's suggestion that the Court hold the 2012 non-compete unenforceable as a matter of law (*see* Doc. No. 13 at 12), at this juncture the Court assumes, without deciding, that the agreement can be enforced.  The Court makes this assumption because it is not convinced that Cooper is *substantially* likely to succeed in showing that the agreement, if enforceable, has been violated.

Specifically, the non-compete bars Mr. Kumar from serving in a "competitive role" with one of the employers listed in the agreement's appendix.  (Doc. No. 7-2 at 3.)  Acuity appears on that list.  But the Court has doubts as to whether Mr. Kumar is serving in a "competitive role," which the agreement defines as "any assistance, service, or ownership relating to the customers,

markets, products and/or services for which the Employee held responsibility during the Employee's employment with" Cooper.  (*Id.*)

First, with respect to the Mr. Kumar's responsibilities with the two companies — the "services" he performs, to track the language of the 2012 agreement — Mr. Kumar served Cooper as an engineer, but Acuity in a managerial role.  (Tr. 81:5-18; 96:11-14.)  In his new position, instead of devoting his time to the research and development of new products, he focuses on profit maximization, market research, pricing strategy, and the like.  (Tr. 131:22-132:5.)  Whereas he never had customer contact at Cooper, Mr. Kumar now has that responsibility with Acuity.  (Tr. 101:25-102:1.)  Mr. Kumar's day-to-day duties appear to have changed markedly.

More fundamentally, with respect to the markets and products that occupy Mr. Kumar's attention, there is further reason to question just how competitive his role is.  That is, Mr. Kumar specialized in ambient lighting for Cooper (Tr. 78:14-19), but has shifted his focus at Acuity to daylighting.  (Tr. 96:11-14.)  The two segments of the lighting business, while hardly unrelated, are fundamentally different: ambient lighting generally requires electricity and daylighting generally does not.  (Tr. 79:5-15; 96:21-97:6.)  Not only is daylighting a small division for Acuity (Tr. 141:9-12), it is a business that Cooper does not even have.  (See Tr. 65:14-15, 134:14-22.)  Mr. Kumar's uncontroverted testimony is that he has not — and likely could not — put Cooper's proprietary information to use with Acuity.  (Tr. 105-106.)  And the fact that Mr. Kumar excuses himself if ever ambient lighting is to come up at a meeting ensures that his focus stays on daylighting.  (Tr. 105:24-106:4.)  Acuity has done all it can to make sure that Mr. Kumar has nothing to do with the ambient lighting world.

Cooper argues that "Defendants' efforts to limit disclosure, however effective or ineffective, serve to highlight that Mr. Kumar is in a competing role." (Doc. 22 at 6.) The Court is not persuaded. Acuity's efforts have served to narrow Mr. Kumar's role and make it such that it (potentially) does not compete with Cooper.[6] Nor should the Court's emphasis on Acuity's efforts to limit Mr. Kumar's responsibilities be taken as a sign that the Court has confused the covenant not to compete with a confidentiality agreement. Rather, the Court seeks to show that Acuity and Mr. Kumar have made genuine efforts to transform a role that perhaps could have competed with Cooper to one that likely does not.

To be sure, "[i]n a preliminary injunction context, the movant need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991). And, Cooper may still prevail on the merits. Daylighting and ambient lighting are often combined to provide lighting solutions. (Tr. 109:21-110:20.) In fact, according to Mr. Ideker, they often *must* be combined. (Tr. 65-9:12.) When they are combined, they can result in lucrative contracts and award-winning presentation. (*See* Tr. 35-37, 39:2-24.) It may well be that additional discovery will demonstrate that Mr. Kumar's work on daylighting has an unavoidable effect on the parties' ambient lighting businesses. Or, it may later be shown that Mr. Kumar has not been nearly as guarded as he and Mr. Khalil suggested at the hearing before this Court and that he has or will put confidential Cooper's information to use for Acuity. But it does not, at this juncture, appear that Cooper has a *substantial* likelihood of success on the merits. Should circumstances change, the Court is willing to reconsider this decision.

---

[6] Indeed, the Court finds compelling the testimony it heard regarding the steps that Acuity took during the on-boarding process to help Mr. Kumar avoid transgressing the non-compete. He was not considered for engineering positions. (Tr. 124:24.) Moreover, his responsibilities, rather than straightforwardly reflecting the job description as written before he was hired, were tailored to avoid any overlap with his work at Cooper. (Tr. 134:9-14.)

Because "[i]n order to secure a preliminary injunction, the applicant must establish each of the preliminary injunction elements," *Olander v. Compass Bank*, 172 F. Supp. 2d 846, 850 (S.D. Tex. 2001) *aff'd*, 44 F. App'x 651 (5th Cir. 2002), the Court, having determined that Cooper does not have a substantial likelihood of success on the merits, need not proceed to analyze additional elements.

## III.    MOTION TO TRANSFER

### A.  Legal Standard

Defendants seek a change of venue under 28 U.S.C. § 1404(a).  Motions under § 1404(a) are appropriate where venue is proper under 28 U.S.C. § 1391, but where, "[f]or the convenience of parties and witnesses, in the interest of justice," the defendant seeks to transfer the suit to another "district or division where it might have been brought."  *Id.* § 1404(a).  Because Acuity is headquartered in the Northern District of Georgia, there is no dispute that the federal court there could exercise personal jurisdiction over Defendant and that this suit could have been filed in that district.  (Doc. No. 2 at 3; Doc. No. 12.)

"[T]he purpose of [§ 1404(a)] is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'"  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26, 27 (1960)).  "There can be no question but that the district courts have 'broad discretion in deciding whether to order a transfer.'"  *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 311 (5th Cir. 2008) (quoting *Balawajder v. Scott,* 160 F.3d 1066, 1067 (5th Cir. 1998)).  In exercising that discretion, courts are to examine a collection of private and public factors.  The Fifth Circuit has explained:

> The private interest factors are:
>
> (1) the relative ease of access to sources of proof;
> (2) the availability of compulsory process to secure the attendance of witnesses;
> (3) the cost of attendance for willing witnesses; and
> (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.
>
> The public interest factors are:
>
> (1) the administrative difficulties flowing from court congestion;
> (2) the local interest in having localized interests decided at home;
> (3) the familiarity of the forum with the law that will govern the case; and
> (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law.

*In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (emphasis and formatting added; citations omitted).

The Supreme Court has held that "[t]he presence of a forum-selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's calculus." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). Concurring in *Stewart*, Justice Kennedy noted that "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Id.* at 33 (Kennedy, J., concurring). Justice Kennedy urged that "a valid forum-selection clause [be] given controlling weight in all but the most exceptional cases." *Id.* The Fifth Circuit recently approved of "incorporating the forum-selection clause into the private and public factor analysis." *In re Atl. Marine Const. Co., Inc.*, 701 F.3d 736, 742 (5th Cir. 2012) *cert. granted*, 133 S. Ct. 1748 (2013).[7] "[B]y incorporating the forum-selection clause into the

---

[7] Other courts of appeals have held that "private parties can, through a forum-selection clause, render venue improper in a court in which venue is otherwise proper under § 1391." *Atl. Marine Const. Co.*, 701 F.3d at 739 (collecting cases). The Supreme Court granted certiorari in *Atlantic Marine*, 133 S. Ct. 1748 (2013), and will consider which approach is proper. A holding that, contrary to the Fifth Circuit's rule, a forum selection clause can render venue improper would mean that the Northern District of Georgia is not a proper venue to hear this suit and

private and public factor analysis, it will be difficult for a party to avoid the contractually-chosen forum." *Id.*

### B. Analysis

The Court begins from the position that the "the plaintiff's choice of forum is entitled to deference; the movant bears a 'good cause' burden and 'must satisfy the statutory requirements and clearly demonstrate that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'" *LeBlanc v. C.R. England, Inc.*, 3:13-CV-282-B, 2013 WL 4463366, at *8 (N.D. Tex. Aug. 13, 2013) (quoting *In re Volkswagen of Am.*, 545 F.3d at 315); *see also Better Bags, Inc. v. Redi Bag USA LLC*, CIV.A. 4:09-CV-03093, 2010 WL 730331, at *5 (S.D. Tex. Mar. 2, 2010) (Ellison, J.) ("Because Better Bags has chosen to bring its case against Redi in its home forum, its choice is given a high degree of deference."); *Lamex Foods, Inc. v. Blakeman Transp., Inc.*, CIV A H-06-3733, 2007 WL 1456010, at *3 (S.D. Tex. May 15, 2007) (Ellison, J.) ("[I]n weighing alternate venues, the plaintiff's choice of venue normally should not be disturbed, unless clearly outweighed by other factors."); *Goodman Co., L.P. v. A & H Supply, Inc.*, 396 F. Supp. 2d 766, 776 (S.D. Tex. 2005) ("A plaintiff's choice of forum is entitled to some deference and generally should not be disturbed unless the balance of factors strongly favors the moving party." (quotation marks and citation omitted)).  The Court acknowledges that, while "[g]enerally, a plaintiff's choice of forum is accorded great deference . . . when a plaintiff is not a resident of the chosen forum, or the operative facts underlying the case did not occur in the chosen forum, the court will not give as much deference to a plaintiff's choice." *Apparel Prod. Servs. Inc. v. Transportes De Carga Fema, S.A. de C.V.*, 546 F. Supp. 2d 451, 453 (S.D. Tex. 2008).  Acknowledging that much of the action at issue here occurred in the Atlanta area,

---

this court would accordingly be obligated to deny Defendants' motion to transfer.  Because the Court does so anyway, it need not await the Supreme Court.

the Court is willing to temper the deference afforded to Cooper accordingly.   But the fact remains that Acuity and Mr. Kumar must make a strong showing to succeed on this motion.

The Court does not believe they can do so.   To begin, it finds the public and private factors to be more or less in equipoise.   With respect to the private factors, Mr. Kumar has at all relevant times worked in the Atlanta area, but Cooper has been based in Houston.   Evidence is therefore likely available in both jurisdictions — though perhaps slightly more so in the Atlanta area.   (Doc. No. 2 at 5.)   Given modern technology, however, this factor need not be considered controlling.   *Lamex Foods*, 2007 WL 1456010, at *3 ("[T]he reality of modern litigation is that because of the telecommunications technology at our disposal, much can be accomplished electronically or over the phone, including interactions with the Court.").   There may be a greater likelihood of unwilling witnesses (who would require compulsory process) residing in the Northern District of Georgia than in Houston, but defendant has not identified any such witnesses to whom this would actually apply.   (Doc. No. 2 at 6.)   And the cost of attendance for willing witnesses may tip toward Atlanta, where Mr. Kumar and his former and future supervisors reside, but either way, some witnesses will be traveling.   (Doc. No. 2 at 7; Doc. No. 12 at 4.)   Weighing against these factors, all of which may point ever so slightly toward the Northern District of Georgia, is the fact that this Court has already gotten up to speed on the issues, considered the motion for a preliminary injunction, and begun to consider which non-compete should be applied and how it should be interpreted.   Transfer at this juncture would require that a new court expend significant judicial resources.   That weighs against granting the motion.

With respect to the public factors, neither side has identified any court-congestion issues or thorny conflict of laws problems.   The Northern District of Georgia has a slightly greater

interest in having a local court decide local issues given that Kumar has worked and wishes to continue working there.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 (1981) (recognizing the "local interest in having localized controversies decided at home" (citation omitted)).  On the other hand, Texas law will apply, which at least slightly favors this district.[8]  (Doc. No. 2 at 8.)

Countervailing against the public and private factors is the forum selection clause.  The Fifth Circuit has not dictated *how* district courts are to work such agreements into their multifactor analysis.  One district court used it as a third consideration, more or less equal to public factors and private factors.  *See LeBlanc v. C.R. England, Inc.*, 3:13-CV-282-B, 2013 WL 4463366, at *12 (N.D. Tex. Aug. 13, 2013) ("On the balance of the private interest factors, public interest factors, and the forum selection clause . . .").  Similarly, other courts considered the forum selection clause to be a third factor to be examined once the court has analyzed the public and private factors.  *See Weber Aircraft, L.L.C. v. Krishnamurthy*, 4:12CV666, 2013 WL 1898280, at *11 (E.D. Tex. Apr. 12, 2013) ("The Court finds that all of the private and public interest factors are neutral or weigh against transfer. However, the Court must also factor in the mandatory forum selection clause."), *report and recommendation adopted,* 4:12CV666, 2013 WL 1898267 (E.D. Tex. May 7, 2013);[9] *Shawn Massey Farm Equip., Inc. v. CLAAS of Am., Inc.*, 4:12-CV-300, 2012 WL 7004153, at *7 (E.D. Tex. Dec. 19, 2012) (same), *report and recommendation adopted,* 4:12CV300, 2013 WL 418469 (E.D. Tex. Feb. 1, 2013).  Yet a third analytical approach is to consider the forum selection clause as a part of the private factors analysis.  *See Shale Consultants, L.L.C. v. Wilson*, CIV.A. 13-1124, 2013 WL 4750066, at *6

---

[8] Acuity's argument that, in a breach of contract dispute, the relevant law is likely to be familiar to any court in America is well taken.  (*See* Doc. No. 2 at 8.)  But, Acuity has also noted in its motion for a preliminary injunction the complicated test used by courts in Texas to determine whether a non-compete agreement is enforceable.  That undercuts, to some extent, that familiarity with applicable law is the same across the board.

[9] The magistrate judge in *Weber Aircraft* also noted that it "ha[d] no guidance from the Fifth Circuit on how the Court should weigh this factor in the section 1404(a) analysis."  *Weber Aircraft, L.L.C. v. Krishnamurthy*, 4:12CV666, 2013 WL 1898280, at *12.

(W.D. La. Sept. 3, 2013).  In any event, the forum selection clause is a factor that decisively cuts in favor of denying the motion to transfer.  Once it is added into the mix, it becomes clear that Defendants have not met their burden.

Acuity's argument that it is not a party to the forum selection clause, and therefore should not be bound by it, does not compel a different result.  In the context of a non-compete agreement, to hold that a forum selection clause carries less weight with respect to an employer, and instead only applies to an employee, would seem to render it almost entirely meaningless. That is, for this Court to decide that the forum selection clause should not be honored, and that this action should be transferred to the Northern District of Georgia, would mean that former employers like Cooper either must file suit against the former employee and the subsequent employer in separate districts, or that they must abandon hope of filing in the district selected in the original contract and instead file suit wherever the subsequent employer wishes to face suit. *Cf. Cont'l Grain Co.*, 364 U.S. at 26 ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that [§] 1404(a) was designed to prevent.").  Or they must forego pursuing action against the future employer altogether.  That is a proposition this court need not countenance.  And in any event, the Court does not consider Acuity "bound by the forum selection clause[]," *Amerisource Funding, Inc. v. Skiba*, CIV.A. H-09-2829, 2009 WL 6472946, at *3 (S.D. Tex. Nov. 17, 2009), just as, under the Fifth Circuit's approach, Kumar is technically not bound by it, either.  But the Court is not willing to ignore it and remove it from the § 1404(a) calculus.

In short, considering the deference due to Plaintiff's choice of forum, the existence of the forum selection clause, and the inconclusive analysis of the public and private factors, the Court **DENIES** the Motion to Transfer.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is **DENIED**. Defendants' Motion to Transfer is also **DENIED**.   Should new facts come to light or circumstances change, Plaintiffs can renew their preliminary injunction request.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this 25th day of October, 2013.

**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**